UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| NORTH AMERICAN SPECIALTY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| HERITAGE GLASS, LLC, DANIEL VICTOR DAVIS, individually, and THOMAS ERIC KERNEY, individually, | ) ) ) ) ) | |
| Defendants, | ) ) | |
| AND | ) ) | No. 2:16-CV-263 |
| DANIEL VICTOR DAVIS, | ) ) | |
| Third-Party Plaintiff, | ) ) | |
| v. | ) ) | |
| CHRISTOPHER R. CORDING, | ) ) | |
| Third-Party Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court following a bench trial in this case, which took place on December 4, 2018. The parties were instructed to file proposed findings of fact and conclusions of law with the Court following the proceedings. Each of the parties filed their proposed findings of fact and conclusions of law for this matter on January 18, 2019, [Docs. 174 and 175]. Neither of the parties filed any responsive pleadings, and the matter is now ripe for review and final disposition.

# I.     FACTUAL BACKGROUND[1]

On March 19, 2014, Heritage Glass, LLC ("Heritage Glass") was formed as a Tennessee limited liability company with the main purpose of manufacturing glass for the solar glass industry in Kingsport, Tennessee, utilizing the equipment and other assets that Heritage Glass purchased from AGC Flat Glass North America, Inc.  [Doc. 142 at PageID # 2137-38].  Heritage Glass's operating agreement established Defendant/Third-Party Plaintiff Victor Davis ("Davis"), Third-Party Defendant Christopher R. Cording ("Cording"), and Defendant Thomas Eric Kerney ("Kerney"), as the three original directors of the board of directors for the company, [Ex. 7].  The board of directors was given the sole power to change the number of directors serving on the board, and was principally tasked with managing the affairs and business of the company, [*Id*.].  The operating agreement also established the role of members of the company; members were not given managing power over the company, but rather, were allowed to invest initial capital contributions for a comparative interest in the company, [*Id*.].

On or about May 5, 2014, Heritage Glass began business and plant operations in the former AGC facility in Kingsport, Tennessee, [Docs. 174 at ¶ 15 and 175 at ¶ 8].[2]  As part of the start-up process for the business, Heritage Glass had to heat up or "unfreeze" a large furnace at the plant to manufacture its glass product.  [Docs. 174 at ¶ 17 and 175 at ¶ 10].  To unfreeze the furnace and keep it operating, the company needed continuous power, and lots of it.  On April 25, 2014, Cording contacted James Gilbert of American Electric Power ("AEP") regarding the supply of electricity to the plant, [Docs. 174 at ¶ 18 and 175 at ¶ 13; Ex. 58].  AEP was willing to contract

---

[1] This Court previously set out the factual background in this case in deciding the Third-Party Plaintiff's motion for summary judgment, [Doc. 165], and those recited facts largely lay out the essence of this dispute.  For purposes of reference for the instant order, as well as in the interest of establishing a complete record, the following facts are found by the Court as proven by a preponderance of the evidence based on the testimony and evidence presented at trial.
[2] Citations to Docs. 174 and 175 in this section are in reference to the numbered paragraphs of the parties' proposed findings of fact.

to supply electricity to the Heritage Glass plant, but, given the substantial amount of power the plant would consistently use per month, AEP required a security deposit of two months estimated usage to enter into an industrial power contract agreement, [Docs. 174 at ¶ 18 and 175 at ¶ 14]. In lieu of cash, AEP stated it would accept an irrevocable letter of credit or a surety bond, [Docs. 174 at ¶ 18 and 175 at ¶ 15]. Ultimately, Heritage Glass's board of directors arranged a security bond— also referred to as the utility deposit bond—in the amount of $525,000 through North American Specialty Insurance Company ("NAS"), [Docs. 174 at ¶ 23 and 175 at ¶¶ 16, 20, and 21]. Before it was willing to issue the security bond of $525,000, NAS required that each of the board of directors—Davis, Cording, and Kerney—personally indemnify the bond, [Docs. 174 at ¶ 20 and 175 at ¶ 18]. Davis, Cording, and Kerney each signed the general indemnity agreement, both in their capacities as directors of Heritage Glass and in their individual capacities to personally indemnify, jointly and severally, the surety bond "from and against any and all Loss." [Ex. 1]. NAS, as surety on the bond, issued the utility deposit bond on behalf of Heritage Glass in the amount of $525,000 on October 3, 2014, [Docs. 174 at ¶ 23 and 175 at ¶ 20].

Operations of the plant quickly commenced, and by December 24, 2014, the company had run up an electric bill of $548,804.79. [Ex. 5]. Unfortunately for Heritage Glass, the company's sales never took off, and it found itself deep in debt without sufficient revenue to weather the storm. Heritage Glass became well-behind on its electric bills. On December 30, 2014, AEP mailed a disconnect notice to Heritage Glass advising the company that AEP had scheduled electric service disconnection after January 13, 2015. [*Id*.]. The disconnect notice stated that "[i]n order to avoid disconnection, [Heritage Glass] must pay $260,725.07 on or before" January 13, 2015. [*Id*.]. While facing these large expenses, the management of the company was in disarray. On December 30, 2014, the board of directors voted by two-thirds majority (Davis and Kerney

together) to terminate Cording as a director. [Ex. 12]. This left Cording with no active involvement in the business decisions or operations of the company after his termination, although he remained an invested member of Heritage Glass. [*Trial Transcript* at 44; Ex. 7 at 6]. Davis thereafter took on a more active role in the operations of Heritage Glass. [*Trial Transcript* at 44]. Around that time, Davis and Kevin Barham ("Barham"), a Vice President of Heritage Glass, met with an investor, Bill Thomas ("Thomas"), in Knoxville, Tennessee about loaning Heritage Glass more money to pay its outstanding bills. [*Id*. at 48-50]. Thomas, a then-existing member of Heritage Glass, agreed to loan an additional $2 million to the company. [*Id*. at 50-51].[3] These monies were not used to pay the outstanding power bill in full; rather, the board of directors and financial officers separated the monies to pay off multiple debts of the company. [*Id*. at 82-85]. Some of the monies were used to pay Davis and Kerney back for some of the personal loans they had made to Heritage Glass. [*Id*. at 51-53; Ex. 35]. Cording had also previously made personal loans to the company totaling $88,000, but the proceeds from the Thomas loan were not used to pay back Cording's loan. [*Id*. at 85-86]. On January 9, 2015, a $306,500 check was made out to Davis, a $165,729.87 check was made out to Kerney's own company—Heritage Manufacturing Company—and a $100,000 check was made out to AEP for the outstanding power bill. [Ex. 35]. All of these checks were signed by Kerney. [*Id*.]. Additionally, the summary of promissory notes being repaid to Davis shows that the January 19, 2015 check of $306,500 to Davis was in partial fulfillment of a $125,000 loan from Davis to Heritage Glass made on the same day. [Ex. 80]. Although the total power bill was not paid in full at this time, the power remained on.

---

[3] Davis testified that he seemed to recall Thomas making two loans, one for $1.5 million and another shortly thereafter for $500,000. The defendant contends that Thomas made a loan of $1.5 million only. [Doc. 175 at ¶ 33]. As the trial record is largely silent otherwise regarding these loans, the Court is inclined to principally rely on Davis' testimony at trial for this fact. In any event, this discrepancy makes no difference to the Court's analysis below.

The story of Heritage Glass's financial difficulties largely stayed the same throughout the following months; it continued to struggle to bring in enough money to pay its expenses. The company never became current on its AEP power bill before ultimately ceasing operation in May of 2015. [*Trial Transcript* at 56]. The company received multiple disconnect notices throughout the beginning months of 2015, and continued to only make partial payments of its power bill. [Ex. 5]. Heritage Glass's last partial payment of $100,000 to AEP was made on April 24, 2015, leaving a previous balance of $327,384.79 as to the March 26, 2015 bill date. [*Id.*]. At some point in May of 2015, AEP shut the power off to the plant. [*Trial Transcript* at 30]. This prompted Kerney and Davis to go to Knoxville and secure an addendum to the original utility deposit bond issued by NAS. [*Id.* at 30-31; Ex. 3]. The addendum increased the original utility deposit bond amount of $525,000 to $750,000, effective May 14, 2015. [Ex. 3]. Afterwards, at some point in May of 2015, the furnace was shut down, and the company ceased heavy glass manufacturing operations because it ran out of money. [*Trial Transcript* at 62-63; Ex. 106; Doc. 142 at ¶ 22].[4] The outstanding electricity bill owed to AEP in the end came to $834,211.28. [Docs. 174 at ¶ 45 and 175 at ¶ 71].

On June 17, 2015, AEP asserted its claim to payment under the utility deposit bond. [Ex. 4]. After determining that Heritage Glass did not have any offsets, credits, or defenses to AEP's claim, NAS paid AEP the full $750,000 bond on August 5, 2015. [Ex. 9]. Thereafter, on December 2, 2105, based on the terms of the general indemnity agreement, NAS made demand of Heritage Glass, Davis, Cording, and Kerney for payment of the $750,000 it paid to AEP. [Ex. 6]. None of the parties made any payment to NAS in response to its demand, and NAS filed suit against Heritage Glass, Davis, and Kerney. [Docs. 1, 174 at ¶¶52-53, 175 at ¶ 77 and 80]. The

---

[4] The company continued to manufacture glass beyond May 2015, but on a much smaller scale. For purposes of the issues before the Court in this case, the operations of the plant ceased in May of 2015.

Court entered default judgment against Heritage Glass and Kerney in favor of NAS on January 31, 2017. [Doc. 34]. Kerney filed a voluntary chapter 7 bankruptcy petition and has received a bankruptcy discharge, relieving him of legal liability to NAS under the indemnity agreement. [Doc. 142 at ¶ 32]. Davis brought a third-party action against Cording for indemnity and contribution. [*Id*. at ¶ 33]. In mediating NAS' original claim, Davis settled with NAS and paid the sum of $600,000 to NAS. [*Id*. at ¶ 34; Ex. 10]. As part of this settlement, NAS agreed to assign Davis its own claims against Cording under the indemnity agreement. [Doc. 142 at ¶¶ 35 and 36; Ex. 11]. Davis seeks to recover from Cording on the $750,000 claim that was assigned by NAS or, alternatively, to recover contribution from Cording.

## II.    DISCUSSION

This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the opposing parties and the amount in controversy exceeds $75,000. The Third-Party Plaintiff has brought Tennessee state law claims against the Third-Party Defendant for contribution and breach of the indemnity agreement. The Third-Party Defendant has asserted the equitable defense of unclean hands against the Third-Party Plaintiff's claims. The Third-Party Defendant has also brought a counterclaim for contribution against the Third-Party Plaintiff contingent on this Court's judgment on the Third-Party Plaintiff's claims. This Court applies the substantive law of the state in which it sits when exercising diversity jurisdiction. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).

### A.  Breach of Contract/Indemnity Agreement

To begin with, the Court reiterates its findings set out in its prior order, [Doc. 165]; there is no dispute that the general indemnity agreement is a valid, enforceable agreement that should be enforced as with any other contract. *See Planters Gin Co. v. Fed. Compress & Warehouse Co.,*

*Inc.*, 78 S.W.3d 885, 892-93 (Tenn. 2002) (explaining that the Tennessee Supreme Court "has consistently recognized that the right of the parties to allocate liability for future damages through indemnity clauses, generally, is not contrary to public policy," and that "even broad transfers of liability, where unambiguous, should be honored."); *see also Hardeman Cty. Bank v. Stallings*, 917 S.W.2d 695, 699 (Tenn. Ct. App. 1995) ("It is incumbent upon this court to enforce contracts according to their plain terms) (citing *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)). Furthermore, the enforceable contract was clearly breached. The indemnity agreement provides that "[t]he [i]ndemnitors shall exonerate, hold harmless and indemnify [NAS] from and against any and all Loss." [Ex. 1]. Heritage Glass failed to pay its outstanding electric bill, an obligation bonded by the utility deposit bond, and NAS was ultimately required to pay $750,000 to AEP. Because the individual indemnitors of the utility deposit bond, Heritage Glass, Davis, Cording, and Kerney, never paid NAS for the loss—the $750,000 NAS paid to AEP—NAS had a valid breach of contract/indemnification claim against all of the individual indemnitors.

NAS did in fact bring suit, but not against *all* of the individual indemnitors. Instead, NAS chose to sue Heritage Glass, Davis, and Kerney for indemnification of the security deposit bond (leaving out Cording). [Doc.1]. This Court entered Default Judgment in favor of NAS against Heritage Glass and Kerney in the principal amount of $764,774.76 plus post-judgment interest, applying joint and several liability to each of these defendants. [Doc. 34]. Davis thereafter brought his Third-Party suit against Cording, seeking indemnity and/or contribution to the extent Davis was liable to NAS, [Doc. 40]. In mediating NAS' claim against Davis, the two parties settled. As part of the settlement, for the sum of $600,000, NAS settled its claim against Davis, and also assigned its right to sue Cording for indemnification of the utility deposit bond to Davis.

This brings us to the core disputes of this case. In essence, at issue is whether Davis' assumption of NAS' right to indemnity against Cording was (1) proper—legally and equitably; and (2) if proper, what compensation is Davis entitled to from Cording.

*Propriety of Assumption of Right to Indemnification*

As a preliminary consideration, the Court finds that the amount at issue with this indemnification claim is $750,000. This finding is quite clear based on the plain language of the contracts between the parties, for the original indemnity agreement that Cording did sign required each individual indemnitor's obligations under the contract to "remain in full force and effect until terminated." [Ex. 1 at ¶ 16]. There is nothing in the record showing that Cording provided notice to NAS of his intent to terminate his obligation.[5] In this sense, although Cording did not have any direct say in increasing the utility deposit bond from $525,000 to $750,000, Cording seemingly acknowledges, as he must, that he remained liable for this increased amount pursuant to his agreement "as an indemnitor under the Indemnity Agreement." [Doc. 175 at ¶ 24 (Davis "unilaterally increased Cording's personal liability under the Indemnity Agreement.")].[6] In other words, whether or not the assignment was proper, there is no question that *before* the assignment, Cording's (joint and several) liability on the indemnity agreement to NAS *included* the increased bond amount of $750,000. At the time of the assignment, NAS had a viable claim against Cording for indemnification of the full $750,000.

1. *As a Legal Matter*

---

[5] Exhibit 99 is an apparent letter drafted by some unknown person to AEP claiming that Cording is no longer responsible for the payments of Heritage Glass because of his termination on December 27, 2014. No mention is made of when or if this letter was sent to AEP, or what it is purported to show. The parties do not cite to this exhibit, and the Court has no knowledge of its application to the case. Without any supporting or clarifying evidence to explain what this document is, the Court declines to consider this exhibit on its own as amounting to anything of substance to the issues in this case.

[6] This citation is to Defendant's *Conclusions of Law* section.

To begin this section, the Court recognizes that the facts presented are unusual, and this Court has, itself, had difficulty finding any substantive binding law on point regarding the legal propriety (or impropriety) of Davis' assumption of NAS' claim against Cording.[7] The Court's overarching view starts with the premise that Tennessee courts have long held to the notion that "the individual right of freedom of contract is a vital aspect of personal liberty," and that in both its statutory and case law, Tennessee "recognizes a strong public policy of individual autonomy, i.e. freedom of contract." *Baugh v. Novak*, 340 S.W.3d 372, 382-83 (Tenn. 2011) (citations and internal quotation marks omitted). "The principle of freedom of contract is 'rooted in the notion that it is in the public interest to recognize that individuals have broad powers to order their own affairs by making legally enforceable promises.'" *Id.* (quoting Restatement (Second) of Contracts, ch. 8, intro. note, at 2-3 (1981)). Furthermore, the general rule is that valid contracts are assignable, and absent some supervening legal policy, the transfer of a contractual right is effective. *See Jackson v. Moskovitz Agency, Inc.*, 672 S.W.2d 400, 403 (Tenn. 1984). Once a valid assignment is completed, the assignor retains no rights under the original contract; the assignee then stands in the position of the assignor, possessing the same rights and being subject to the same defenses. *Collier v. Greenbrier Developers, LLC*, 358 S.W.3d 195, 201 (Tenn. Ct. App. 2009).

Here, there is no dispute that there was originally a valid contract between NAS and Cording specifically regarding his promise to indemnify NAS upon payment of the utility deposit bond. Further, there is no factual dispute calling into question the assignment agreement between NAS and Davis. *See* [Ex. 11]. The facts show that NAS did assign its right to Davis to recover against Cording for any claim it had under the indemnity agreement. The Court has not found any

---

[7] As an aside, neither of the parties cite any binding case on point setting out legal principles resolving this matter. Davis resorts to the doctrine of the law of the case based on this Court's prior orders, even though this Court declined to make a definitive ruling on the matter with questions of fact remaining, and Cording turns directly to equitable principles (the doctrine of unclean hands) arguing that recovery is barred.

principle of law—nor have the parties provided any—that renders the assignment of NAS' right to indemnification to Davis invalid.  The parties have not shown, nor attempted to show, that there is any legal precedent[8] which disallows a co-indemnitor to assume a claim of the indemnitee against a co-indemnitor.  Without any showing that such assignment was legally barred, the Court finds that NAS' assignment to Davis of its right to indemnification of the utility deposit bond against Cording was, as a legal matter, proper.

   *2.  As an Equitable Matter*

   The defendant relies on the equitable doctrine of unclean hands in defending against the plaintiff's claim for indemnification.  In this sense, the defendant is not claiming that the assignment itself was improper; rather, the defendant principally relies on the notion that Davis' *use* of the assignment to recover monies from Cording is inequitable.  The doctrine of unclean hands is an equitable defense that bars relief in certain instances.  Tennessee courts have described the doctrine generally, stating that

> he who comes into a Court of Equity asking its interposition in his behalf, must come with clean hands; and if it appears from the case made by him, or by his adversary, that he has himself been guilty of unconscientious, inequitable, or immoral conduct, in and about the same matters whereof he complains of his adversary, or if his claim to relief grows out of, or depends upon, or is inseparably connected with his own prior fraud, he will be repelled at the threshold of the court.

*Spirit Broadband, LLC v. Armes*, No. M2015-00559-COA-R3-CV, 2017 WL 384248, at *6 (Tenn. Ct. App. Jan. 27, 2017) (quoting *C.F. Simmons Med. Co. v. Mansfield Drug Co.*, 23 S.W.165, 168 (Tenn. 1893)).  It is worth mention that the unclean hands defense is generally *not* a mechanism to *invalidate* the assignment of NAS' claim to Davis, rather, the unclean hands defense will operate only to "deny recovery altogether" to an offending party.  *Nolen v. Witherspoon*, 187 S.W.2d 14, 16 (Tenn. 1945).  As mentioned in this Court's prior order, "[t]he Court has found no case barring

---

[8]  Equitable considerations of the NAS assignment are discussed below.

an assignment of a cause of action from a settling plaintiff to a co-indemnitor based on the unclean hands defense." [Doc. 165 at PageID # 2424]. The defendant has not provided any binding authority standing for the proposition that equitable reasons render this assignment invalid. Indeed, the defendant has properly framed his defense by requesting the Court to bar Davis' recovery altogether. Based on the particular facts of this case, the assignment of NAS' claim for indemnification against Cording was equitably proper. The issue this Court must determine is whether the unclean hands defense bars the Third-Party Plaintiff's recovery for indemnification in totality.

### 3. Application of Unclean Hands Defense

Having appropriately framed the issue, the Court now considers the application of the unclean hands defense to the instant case. To begin with, and as this Court has previously stated, "Tennessee law makes no suggestion that one could invoke defenses against the assignee [of a contractual right] that would not have been available against the assignor." [Doc. 165 at PageID # 2422]. Following that logic, as Davis now "stands in the shoes" of NAS in bringing his breach of contract/indemnity agreement claim, Cording's defenses against this claim should, in this Court's view, be *limited* to those that Cording could have asserted in defending against NAS. Here, the Court is not aware of any reason why Cording could not have invoked the equitable defense of unclean hands against NAS. However, in this sense, Cording is not asserting that NAS acted inequitably, thus Davis is subject to that unclean hands defense. Rather, Cording brings his unclean hands defense against Davis for Davis' own actions *before* he "stood in the shoes" of NAS. Although admittedly the instant defense brought forth by the defendant does not squarely fit within the limitations described above, the Court has been unable to find authority on this particular issue, and the parties have not provided any. Whether or not Tennessee law would allow

a defendant to assert such a defense against an assignee of a contractual right who is "standing in the shoes" of the assignor is ultimately immaterial to the instant case, and the Court will proceed under the assumption that such a defense may be asserted for purposes of this matter.

Tennessee courts have made clear that "Cording's affirmative defense could only consider Davis' conduct related to the indemnity agreement *assignment* and not Davis' previous illicit and unconscionable conduct." [*Id.* (emphasis added)]; *see also Spirit Broadband, LLC*, 2017 WL 384248, at *6 (in analyzing the unclean hands defense, "[t]he focus of [the court's] inquiry is whether the alleged misconduct was directly related to the transaction which formed the basis" of the original claim); *Chappell v. Dawson*, 308 S.W.2d 420, 422 (Tenn. 1957); *Nolen*, 187 S.W.2d at 16 ("'Clean hands' means a clean record with respect to the transaction with the defendant, and not with respect to any third person."); *Metric Partners Growth Investors, L.P. v. Nashville Lodging Co.*, 989 S.W.2d 700, 703 (Tenn. Ct. App. 1998) ("[T]he unconscientious conduct must arise out of the particular transaction which is the subject of the litigation."). The question then becomes, was Davis' conduct in managing the affairs of Heritage Glass before it ceased operations *related to* the assignment? This Court finds that it was not.

To begin with, Davis' direct testimony at trial went largely unrebutted. Davis testified that the decisions made by the board of directors were all in efforts to keep Heritage Glass operational. The evidence shows that Davis made multiple personal loans to Heritage Glass throughout the course of his tenure on the board of directors to keep money flowing into the company. The defendant only offers theories as to why the board of directors used monies it did come across to pay some bills/debts rather than others. There is nothing in the record to suggest that any of the decisions made by Davis as a director was in contemplation, or with any knowledge at all, of the future assignment of NAS' claim to indemnification of the utility deposit bond against Cording.

Further, there is nothing to suggest that Davis' increase in the bond amount to $750,000 was in anticipation or relation to his intent to assume the right to indemnification against Cording. The defendant points to the timing of the bond increase as well as the method (that is, that Davis unilaterally increased the bond without Cording's input). However, the Court has been unable to find any evidence whatsoever that Davis had knowledge (or even considered) that NAS would assign their right to sue Cording after the bond was paid to AEP. Indeed, it was, in totality, NAS' claim until the settlement was made, and the defendant has not provided any fact that Davis knew—or even suspected—that NAS was willing to sell their claim to him. Without such knowledge, Davis could not have been acting with the intent to accrue a windfall in his favor by increasing the amount of the bond because he was necessarily also increasing *his own personal liability* in direct proportion. And, without knowledge that he could end up with NAS' claim against Cording, there is simply no connection linking Davis' actions as a board member of Heritage Glass to the transaction of assuming the instant claim.

This effectively ends the inquiry right here, for this finding leaves us with no facts *relating to the assignment* to suggest that Davis' claim should be barred by the doctrine of unclean hands. All of the facts which the defendant relies upon in asserting his unclean hands defense resort to Davis' actions while managing the business affairs of Heritage Glass. The defendant did not produce any evidence at trial showing that Davis' securing the assignment was linked, in any way, to his decisions as a director of Heritage Glass. The Court finds Cording's defense of unclean hands unavailing.

And even assuming *arguendo* that Davis' actions had been linked to his procuring of NAS' claim against Cording, the particular facts of this case do not bar Davis' recovery based on the application of the unclean hands defense in this Court's view.[9]

The main thrust of the defendant's unclean hands defense revolves around the handling of the Thomas loan of $2 million made to Heritage Glass in late 2014. To recap, at the time these monies were acquired and disbursed, Heritage Glass was already facing substantial electricity bills to AEP (including a pending disconnect notice), the company was not bringing in enough capital on its own to pay its many bills, Davis and Kerney—as two-thirds of the company's board of directors—had recently taken action to terminate Cording from the board of directors, and Davis, Kerney, and Cording (among other investors) had each previously made personal loans to keep Heritage Glass operational to this point. The defendant argues that the Thomas loan was made to pay the outstanding electric bill, and by not fully repaying this bill with these monies, Davis acted wrongfully and now presents to this Court with unclean hands.

The Court declines to make this conclusion based on these facts. First, the Court does not find that the Thomas loan was provided for the limited purpose of paying the outstanding AEP power bill in its entirety. Indeed, there is no evidence in the record conclusively supporting the defendant's position on this fact. As both parties—including the defendant—point out, and as this Court has found, at this point in time, Heritage Glass had a whole host of outstanding bills to pay without sufficient revenue to pay them all. Davis' testimony on this fact is consistent with the other evidence bearing this out. *See, e.g.*, [Ex. 66]. Second, the defendant did not put on any evidence of his own directly contradicting this fact. The defendant relies heavily on Davis'

---

[9] Although the Court's finding above that Davis' actions while managing the business affairs of Heritage Glass do not relate to the assignment by NAS, standing alone, is sufficient to dispose of Cording's defense of unclean hands as to Davis' assumption of NAS' right to indemnification against Cording, the Court would have applied the below findings as to the facts of this particular case had these decisions been shown to be linked to the transaction at issue.

deposition testimony, arguing that it contradicts Davis' trial testimony. Davis did not, however, testify in his deposition that the Thomas loan was made *for the purpose of paying the electricity bill in full*; rather, Davis testified that he asked Thomas for money that was needed "to pay bills. The electric bill mainly." [*Trial Transcript* at 50]. The Court finds Davis' deposition testimony on this issue largely consistent with his trial testimony in that the Thomas loan was made to help pay the bills of Heritage Glass. There is no evidence that the Thomas loan was made for the sole purpose of paying off *the entirety* of the current electric bill. Third, the defendant could have provided other evidence (say Thomas' own direct testimony, or anything at all from Thomas regarding the reason for his $2 million loan) but did not, and the Court declines to speculate what Thomas would have claimed as the reason he loaned this money to Heritage Glass.

Accordingly, the Court finds that the Thomas loan was made to pay the bills of the company to keep it going. And, in effect, it did just that. Indeed, the monies paid to AEP from the Thomas loan, although not used to fully pay off the outstanding electric bill, successfully kept the plant running by paying enough to satisfy the disconnect notice. After January 13, 2015, the power stayed on, and the plant continued to operate. The decision to prioritize some bills over others with the whole of the Thomas loan—including repayment of loans made to the directors themselves—is of no ultimate consequence in the Court's view. Even though the defendant argues, in hindsight, that the bill could have been paid in full at that time with the loaned monies, this is largely irrelevant.

And going further, whether or not the bill was paid in full at that time, there is no contention that the continuing operation of the plant (with a fully paid for electric bill in January of 2015) would have led to a different financial outlook in May of 2015. In other words, there is nothing in the record suggesting that full settlement of the power bill in January was the solution to the

problem. The plant required continuous power to operate, and the electric bill would continue to build up extensively without enough income to support it. The evidence shows that the problem at hand was not the amount of the outstanding current electric bill, but rather, the company's lack of revenue to support the plant's continuous operation. And the fact that the electric bill was bonded by NAS does not persuade the Court that the repayment of loans made by Davis and Kerney instead of paying the electric bill in full at that time was unconscionable conduct. There is nothing in the record showing that paying the full electric bill in January would keep the bond from ultimately being needed. A review of the company's profits and losses actually shows otherwise. Indeed, even had the full electric bill been paid in January, the evidence in the case largely reveals that Heritage Glass needed substantially more capital to render it sustainable long-term.

In essence, the board of directors had the authority and duty to disperse the monies of the Thomas loan as they saw fit, and the Court has not found any limitation to this in the record. The use of the monies to pay the electric company only enough to keep the power on rather than in full, and to use the remaining funds to pay other debts as well, is entirely proper in this Court's view based on this record. The company assuredly had many bills to pay, and not enough money to go around, so difficult financial decisions had to be made in what the $2 million Thomas monies would be used for. There is simply nothing this Court has found in the record showing otherwise. That the defendant would have wanted the board to handle the funds differently is, inevitably, beside the point.

Additionally, the evidence showing that Davis loaned $125,000 to Heritage Glass the same day that the company repaid $25,000 of that loan is of no consequence to the Court's ultimate determination. Although the Court recognizes that this event is unusual and slightly peculiar, there

is nothing in the record expanding on this issue. Without more, the Court must take the transaction at face value, that is, that Davis loaned $125,000 and was paid back the same day $25,000 of that loan. The defendant did not provide any evidence inconsistent with this contention. Thus, the Court finds this issue largely irrelevant to the question at hand.

In considering the removal of Cording from the board of directors by Davis and Kerney's two-thirds majority before these decisions were made, the Court finds this fact is also of no ultimate consequence. Indeed, the board of directors was given the authority to remove directors by majority vote, and the evidence at trial simply does not provide any reason suggesting that Cording's termination was improper.

Davis' increase of the NAS bond amount further has no bearing on the unclean hands defense in the Court's view. Regarding this event, it is important to remember that NAS agreed with Heritage Glass to increase the amount NAS would pay if the bond were to be forfeited. At the time, Davis was faced with a termination notice from the power company which would effectively shut down the operations of the plant. The Court does not find it "crooked" or "unconscionable" for Davis to agree with NAS to increase the bond in an attempt to extend the amount of time the plant could remain operational with power, especially considering that he was increasing his own ultimate personal liability in the process. Indeed, nothing in the original indemnity agreement or operating agreement of the company limited the power of Davis to increase the bond as he did. Cording did not present any persuasive *evidence* expanding on his theory that this action rendered Davis' hands unclean.

Whether or not the company was ultimately able to meet the increased obligation under the amended utility deposit bond is immaterial. By bonding the additional amount of $750,000, it was principally NAS that was assuming the immediate risk associated with increasing the bond

amount, for it was the holder of the bond. And, as stated above, Davis was increasing his own personal liability in the same proportion to the other individual indemnitors.

*4. Conclusion*

The Court holds that both legally and equitably, NAS' assignment of its right to indemnification from Cording for the full amount of the amended utility deposit bond to Davis was proper. Further, the Court finds that the defendant has not provided any fact relating to this assignment to suggest that Davis' claim for indemnification should be barred by the unclean hands defense. Further, even if Davis' conduct in managing the business affairs of Heritage Glass on the board of directors was related to the assignment, the Court declines to conclude that Davis acted unconscionably or inequitably as to bar his recovery by the defendant's unclean hands defense. As to Davis' contribution claim, the above findings equally apply; that is, that none of the facts outlined by the defendant are related to the contribution claim, and even if they were, the Court declines to conclude that Davis acted unconscionably or inequitably. Therefore, Davis is also not barred from recovery for his claim for contribution based on the defendant's unclean hands defense.

**B. Contribution and the Amount of Compensation Due**

Having found that the NAS' assignment was proper, the Court must determine the amount of compensation due. The Third-Party Plaintiff and the Third-Party Defendant have each brought claims against the other for contribution. "It has long been held by [the Tennessee Supreme Court] that one party seeking 'contribution' against another cannot recover until payment of more than his share of the joint obligation." *Frazier v. Frazier*, 430 S.W.2d 655, 660 (Tenn. 1968) (citing *United States Cas. Co. v. Std. Acc. Ins. Co.*, 136 S.W.2d 504 (Tenn. 1940)). In other words,

"neither party is liable over for 'contribution' . . . until and unless the party seeking same has paid in excess of his share of the entire promissory obligation." *Id*.

Setting aside the Third-Party Plaintiff's assumption of the indemnification claim for a moment, and focusing *only* on his contribution claim as an indemnitor of the utility deposit bond himself, Davis has unquestionably paid more than his pro rata share of the agreement. Indeed, looking at the amended utility deposit bond, all of the original indemnitors (Heritage Glass, Davis, Kerney, and Cording) are jointly and severally liable to repay the full bonded amount of $750,000.[10] At first glance, if every individual indemnitor paid their pro rata share of the agreement, each would be individually liable for $187,500 ($750,000/4). However, there are a few changes to the equation based on the facts of this case.

As an initial matter, this Court finds that Heritage Glass and Kerney are unlikely to pay their share of the obligation. This Court has entered judgment against Heritage Glass, but this company is now insolvent and has been presumably dissolved. [*Trial Transcript* at 62-63; Ex. 106]. Furthermore, after NAS filed the original lawsuit in this matter, Kerney filed a voluntary chapter 7 bankruptcy petition and has received a bankruptcy discharge as to this debt, relieving him of any legal liability to NAS as an indemnitor under the Indemnity Agreement. [Doc. 142 at ¶ 32]. That ultimately leaves us with two (Davis and Cording) to fit the bill.

Secondly, the claim for the full $750,000 was settled at $600,000. The Court has not found other cases dealing with this particular type of scenario through the common law.[11] Nonetheless, the Court finds that it would be inequitable for Davis to benefit from the windfall if he were to

---

[10] *See* Discussion *supra* Section II.A.
[11] A similar scenario was encountered in *Dubina v. Mesirow Realty Dev., Inc.*, 719 N.E.2d 1084 (Ill. App. Ct. 1999), but this appellate court considered similar factual issues under Illinois' statutory law (in Illinois, the Contribution Act) rather than the common law. In that matter, the state appellate court found that a settlement with a co-defendant which includes a condition that assigns the original plaintiff's cause of action to the settling defendant, allowing the settling defendant to "recoup their share of damages, perhaps make a profit," undermined the goal of the Contribution Act to apportion damages equitably and declined to uphold the settlement. *Dubina*, 719 N.E.2d at 1091.

recover *in contribution* based on the full $750,000, when he was only individually held to a total obligation of $600,000. Realization of such a windfall in his favor would be against public policy and would render an inequitable result in this Court's view. Therefore, as to Davis' contribution claim, Cording and Davis should each be held liable to the total *actual* amount paid under the indemnity agreement, $600,000.

Furthermore, in this Court's view, it would be against the equitable apportionment of damages to allow the Third-Party Plaintiff to settle with the original plaintiff and realize a significant profit by receiving the full $750,000 by standing in the shoes of NAS through its indemnity claim against Cording. *Cf. Dubina*, 719 N.E.2d at 1091. This simply would run afoul of the principles of equity and justice. Further, allowing recovery on Davis' indemnification claim would effectively be an exercise in futility because after consideration of Cording's claim for contribution, the equitable result, in this Court's view, would inevitably return to the final conclusion it reaches below.

As such, it boils down to this: based on the Court's findings in this Memorandum Opinion and Order, Davis has paid $600,000 to make good on his promise to NAS, and Cording has not paid any on his obligation to this point. Davis is entitled to contribution from Cording for the excess Davis has paid. As they are the only remaining two individuals responsible for the obligation under the utility bond deposit, each should be equally responsible for half of the amount. This means Cording is on the hook for his half—$300,000 (the total *actual* amount paid, $600,000 divided by 2) in contribution. As Davis' indemnification claim would ultimately lead this Court to reach the same result, the Court need not consider Cording's contingent counterclaim for contribution, and it is **MOOT**.

### C. Conclusion

Based on the above findings and conclusions, it is **ORDERED** that the Third-Party Plaintiff, Daniel Victor Davis, is entitled to contribution from the Third-Party Defendant, Christopher R. Cording, in the amount of $300,000.  The Third-Party Defendant's counterclaim for contribution is **DISMISSED AS MOOT**.

Davis shall file his brief regarding his request for an award of reasonable attorneys' fees and out of pocket expenses incurred in this case on or before September 6, 2019.  Thereafter, the defendant shall have ten (10) days from the filing of the plaintiff's brief to file his response.  The Court will not consider any Reply brief on this issue, and no oral argument will be entertained.  A final Judgment shall enter after this Court has ruled on these collateral issues.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE